[Civ. No. 15598. First Dist., Div. Two. Jan. 25, 1954.]

THE BREAKERS HOLDING COMPANY (a Corporation), Respondent, v. THE JOSEBRA COMPANY (a Corporation) et al., Defendants; JOSEPH ABRAMS, Appellant.

Bertrand F. Lurie and Leonard S. Lurie for Appellant.

Harry Gottesfeld, Joseph A. Brown and Hutchinson & Quattrin for Respondent.

KAUFMAN, J.—This is an appeal by Joseph Abrams, an individual, defendant below, from a judgment against him in the amount of $10,876.74 plus interest, arising out of a sale by him to respondent of imported Portuguese brandy. The trial court held that a certain document and transaction of December 11, 1945, constituted an agreed and voluntary rescission by the parties of the purchase orders for the 400 cases of brandy, and the court approved and confirmed said rescission, giving judgment in favor of respondent for the purchase price paid plus certain incidental expenses and interest.

Appellant was a wholesale liquor merchant in San Francisco doing business as Josebra Company. Respondent corporation operated a restaurant and bar, The Breakers, at Mason and O'Farrell Streets in San Francisco. Prior to the transactions here involved, respondent had been a regular customer of appellant, dealing through appellant's salesman Salbert. During the latter part of 1943 when a shortage of domestic distilled spirits appeared imminent, Salbert proposed to respondent the sale of Portuguese brandy which appellant was then importing, stating that it was good brandy, that respondent was lucky to get it, and that he was doing respondent a favor to furnish him with part of the shipment.

Mr. Adams, president of respondent, placed an order with Salbert on August 17, 1943, for 200 cases from a shipment expected to arrive within a few months. Respondent gave him a check for $1,000 on the purchase price, and on October 1, 1943, ordered another 200 cases of brandy expected from Portugal at a later date. Another deposit receipt agreement was executed, appellant receiving a second check for $1,000 from respondent on account.

On November 11, 1943, respondent purchased 50 cases of Portuguese brandy which appellant had in stock, and this lot was delivered to respondent's place of business and was paid for. Fifteen cases out of this lot were sold by respondent at a profit. During the trial respondent withdrew the issue as to this lot, hence it is not involved on this appeal.

The first order of 200 cases arrived in San Francisco during December, 1943, and was placed in a federal bonded ware-

house, under bond No. 2317. Upon payment of the balance due, the storage company issued its receipt to respondent evidencing its title to the 200 cases. The second lot of 200 cases arrived during the month of February, 1944, and the same procedure was followed as in the case of the first lot. From the date of arrival until withdrawn in December, 1945, the two lots remained in bond in the name of respondent who paid all storage charges to the warehouse company.

In April, 1944, the Pure Food and Drug Division of the State of California, suspecting that some bottles of imported Portuguese brandy might contain particles of glass, issued a statewide order to all distributors and sellers of such brandy, requiring them to withhold further sale until inspection could be made to determine the condition of the brandy. The federal authorities issued a similar order, hence the 400 cases sold to respondent were detained by the federal government for examination but were subsequently released, said releases being directed to the Josebra Company, and produced by them at the trial.

Respondent first learned of the quarantine from reports in a San Francisco newspaper. On the same day he was visited by appellant's salesman, Salbert, with whom he discussed the report. Respondent's president, Adams, testified that Salbert assured him that Josebra Company would filter the brandy and put it in a salable condition before he would have to take it, or before he did take. Salbert said that they had to pick up the brandy wherever they had delivered it and return it. Adams told Salbert that if it had to be filtered or anything, he didn't want it. Salbert responded that everything would be taken care of.

On April 26, 1944, appellant sent a form letter to all of its customers advising them to return all Portuguese brandy, and that it would be examined and returned at appellant's expense. Appellant admits that the 400 cases of brandy ordered by respondent were examined, cleared and released at appellant's sole expense while in the federal bonded warehouse.

On December 11, 1945, the following document was executed by respondent and accepted by appellant. It reads as follows:

"San Francisco, California
December 11, 1945

"In consideration of our transfer to Josebra Company of ownership of brandy now stored in the San Francisco Ware-

house Co. in customs—bond, tax unpaid, the undersigned shall be released of all liability for payment of any balance due for taxes on account of such merchandise, and Josebra Company upon such transfer shall be entitled to sell or dispose of the same to any person or firm whosoever for which purpose we relinquish to Josebra Company all our rights, ownership, title and interest therein.

Breakers Holding Corp.

(Signed)  Forrest Adams
President''

Following the execution of this document the brandy was exported to China for sale under appellant's export license. Respondent's president Adams testified that a friend of his, a Mr. Scanlon (who died prior to the trial) wished to buy the brandy from respondent for export. He told Scanlon that he could not sell it to him because he had no license. Scanlon asked where he had bought it, and when told, said that they would go down there and see if Adams could turn it back, and if so, he, Scanlon, would make arrangements to export it. Adams testified that he went to appellant's office with Scanlon, that they were not there very long, that Scanlon and Abrams talked of shipping other things besides brandy to China, and that he didn't pay much attention to this discussion as he wasn't interested. As they were leaving, someone in the office said that Scanlon would pay them and they in turn would pay The Breakers. That was the only time he was in appellant's office. When asked if he had not sold 150 cases of the lot of 400 in China at $100 per case, he flatly denied it, saying that The Breakers Corporation had nothing to do with the brandy after it was released.

Appellant's sole proprietor, Abrams, who attended the conference with Adams and Scanlon, was questioned very briefly by his counsel on direct examination. In regard to what took place at the conference he was asked only if he had made the remark, ''Now we have the merchandise—you can whistle for it,'' which he denied.

Davis, a former employee of appellant who was present with Abrams, Adams and Scanlon at the meeting in appellant's office, testified that Adams said he wished to dispose of the brandy by shipping it to China. Davis said he advised him that it could not be done without a federal export license. He was asked if Josebra Company could export it for the account of The Breakers, and he told them it could be done

legally if title rested with Josebra. He suggested that it could be transferred back without other monetary consideration than $1.00. Adams, he said, told him that he wished to export it, and that Scanlon would handle disposition of it in China. He thought that the transfer of title was drawn up in the next day or so. Davis said that he pointed out to Adams and Scanlon the large amount of detail work involved in preparing an export shipment, that his firm would take care of these matters for $1.50 per case or a total of $600. Appellant introduced in evidence a check signed by Adams with date stamped December 10, 1945, for $600 on which was written "Warehouse Expense Exportation of 400 cases of Brandy." Another check for $724.85 signed by Adams matched in amount appellant's invoice dated January 2, 1946, for charges in preparing and loading the shipment.

Jaeger, an insurance broker, who had dealt with respondent's Mr. Adams for years, and who had also been an accountant for respondent, handled the policy of marine insurance on the cargo. He stated that Scanlon paid for the policy and that Adams was to pay for the ocean charges. Adams testified that Scanlon needed help, therefore he advanced him the money and had his bookkeeper draw the check.

On this appeal appellant contends (1) that the trial court's findings are not supported by the evidence; (2) that the judgment is based on findings of fact and conclusions of law outside the issues joined by the pleadings; (3) that the amount of the judgment is not sustained by the evidence.

The amended complaint contains three causes of action: the first a claim for damages in fraud for knowingly selling plaintiff merchandise unfit for human consumption; the second, for breach of warranty; the third, a claim for $600 for money had and received.

Appellant contends that the first paragraph of the findings imply that respondent proved all five elements essential to the proof of fraud. However, in the conclusions of law no mention is made of a cause of action for fraud, but they are based solely on breach of implied warranty. The judgment is based entirely on the second cause of action for breach of implied warranty. ■ Rescission and return of the purchase price are proper when there has been a breach of warranty. (*Fox* v. *Stockton Combined Harvester etc. Works,* 83 Cal. 333 [23 P. 295]; Civ. Code, § 1789, subd. (d); 22 Cal.Jur. 1009 and cases cited.)

The main question involved is whether there is evidence in the record to support the trial court's finding of a rescission entitling the respondent to a return of the purchase price.

The document executed by respondent and accepted by appellant, together with the discussion between Adams, respondent's president, and Salbert, appellant's agent, was ample to justify the trial court's finding that there had been an agreed rescission by the parties and that respondent was entitled to the return of the purchase price paid.

Evidence offered by respondent showed that the merchantability of the Portuguese brandy depended to a great extent on the demand occasioned by the lack of other domestic liquors being produced. By the time the several months' quarantine had elapsed, the demand for Portuguese brandy had died down because of domestic production, and because of the unfavorable publicity, it had become a drug on the market. Respondent points out that what the inspection disclosed as to the contents of these 400 cases of brandy was within the knowledge of appellant, but he did not disclose the results of the examination at the trial. But, as respondent contends, the discussion of these matters is really beside the point, since the parties themselves construed the contracts and the quarantine as justifying a rescission which was carried out to the extent of the return and acceptance of the merchandise as evidenced by the document of December 11, 1945.

Appellant contends that unreasonable delay can defeat a claim for breach of implied warranty (*Williams* v. *Lowenthal,* 124 Cal.App. 179, 187 [12 P.2d 75]). It was respondent's duty to inspect within a reasonable time (Civ. Code, § 1767). The trial court, however, found that a reasonable time for inspection had not expired in April, 1944, when respondent was notified that the brandy was quarantined, and that such quarantine continued until December, 1944. The trial court also found that upon being advised of the quarantine respondent advised appellant that it would not accept said brandy and that appellant must retake the same. These findings are supported by the evidence reviewed above.

In contending that the evidence does not support the judgment, appellant argues that the evidence in regard to the export arrangements clearly shows that respondent and Scanlon entered into a joint venture to ship the brandy to China, and that appellant was merely acting for respondent in the performance of certain services. In the original complaint there had been a fourth cause of action which does not appear

in the amended complaint, which asked damages occasioned by alleged wrongful acts of appellant in connection with the export shipment to China. At the trial one of respondent's counsel testified that this cause of action was inserted by mistake, that it had been intended as part of a complaint to be filed by Scanlon against appellant. This matter was gone into at some length during the trial. The trial court evidently believed respondent's explanation. This court cannot, therefore, say that the allegations in the original complaint impeach respondent's testimony as a matter of law.

Defendants asked for a bill of particulars in regard to the third count in the amended complaint—the claim for $600. The bill of particulars furnished by respondent stated that the money was paid to defendants to perform services in connection with preparation of brandy for sale in the China market, that defendants prevented its sale by their misconduct, rendering the expenditure useless. The trial court found the allegations of this cause of action to be untrue.

Appellant attacks the trial court's general finding wherein paragraph VI of the second cause of action was found to be true. However, since the court subsequently made a specific finding in regard to the discovery of the unfitness of the brandy and the rejection thereof by respondent, this specific finding controls the general finding and is sufficiently supported by the evidence. ■ Where in addition to general findings a court makes specific findings as to particular averments of the pleadings, the latter will control in the case of inconsistency. (See 24 Cal.Jur. 974, § 206, and cases there cited.)

It is claimed by appellant that the finding of rescission is not within the scope of the issues as framed by the pleadings and cannot support the judgment. Respondent's complaint was framed on a damage theory, and appellant maintains that since damages and rescission are inconsistent remedies, respondent must make an election of one or the other. Respondent did not amend its complaint during trial to plead a rescission. *Shaw* v. *McCaslin*, 50 Cal.App.2d 467 [123 P.2d 102], is cited by appellant to the effect that issues are made by the pleadings, not by the evidence introduced. Although the rules are very liberal, they have not gone so far as to make pleadings meaningless. (*Gwinn* v. *Goldman*, 57 Cal. App.2d 393, 405 [134 P.2d 915].)

Respondent contends that the case of *Hartzell* v. *Myall*,

115 Cal.App.2d 670 [252 P.2d 676], supports its position, and that appellant is confusing remedies with causes of action. In the cited case it is explained (p. 677) that a cause of action is stated when the facts constituting fraud are alleged and a resulting injury pleaded, that damages constitute the relief afforded, and that the extent of the relief depends upon proof, "the relief being limited by the measure of the damage which the law prescribed. This measure need not be pleaded, nor is the plaintiff required to state in his pleading the manner in which he computes the amount of damages which he demands. (15 Am.Jur. 747.) These are matters which are to be regulated upon the trial in accordance with prescribed legal limitations." The law affords under section 1789, Civil Code, the remedy of rescission for breach of warranty.

█ That respondent is not required to elect between recoupment after rescission and damages was reaffirmed in the case of *Williams* v. *Marshall,* 37 Cal.2d 445, 457 [235 P.2d 372]. Appellant points out, however, that in the cited case the complaint asked for relief in the alternative. █ Nevertheless, if the parties proceed throughout the trial as if a certain issue is presented for adjudication, both parties are estopped from claiming that no such issue was raised by the pleadings.

█ But if evidence admissible for one purpose tends to establish another issue, if such issue is not before the court, it cannot be used to establish that issue. (*Miller* v. *Peters,* 37 Cal.2d 89, 93 [230 P.2d 803].) Respondent has pointed out certain transcript references showing that counsel stated that respondent was suing for the purchase price. On one occasion appellant's counsel stated: "You're not suing here for rescission," whereupon respondent's counsel replied: "We are suing to get back the money you people got for the brandy. That is what we are suing for, the money that these people have been deprived of."

█ Appellant contends finally that the judgment in the amount of $10,876.74 is without support. The purchase price of the brandy was $9,751.74. The judgment provided for $1,125 for reimbursement for the amount expended in storage and protection of the brandy. Since storage charges were at the rate of $28 per month, appellant says that the total could not exceed $672. However, as respondent points out, appellant is ignoring insurance charges and repackaging charges. Appellant's reply brief does not further urge this contention.

We conclude that the trial court's finding that there was an agreed rescission is ample to support its judgment for the purchase price paid together with incidental costs and expenses borne by respondent.

Judgment affirmed.

Nourse, P. J., and Dooling, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 25, 1954.